## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## AT NASHVILLE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
|     **upon the relation and** | ) | |
|     **for the use of** | ) | |
| **TENNESSEE VALLEY AUTHORITY,** | ) | |
| | ) | |
|         **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 3:06-cv-00421** |
| | ) | |
| **AN EASEMENT AND RIGHT-OF-WAY** | ) | **Judge Thomas A. Wiseman, Jr.** |
| **OVER A TOTAL OF 21.4 ACRES OF** | ) | |
| **LAND, MORE OR LESS, IN** | ) | |
| **MONTGOMERY COUNTY, TENNESSEE,** | ) | |
| | ) | |
| **AND** | ) | |
| | ) | |
| **JEFFREY H. JORDAN, and** | ) | |
| **PATTI B. JORDAN,** | ) | |
| | ) | |
|         **Defendants.** | ) | |

## REPORT OF THE COMMISSION

This commission was appointed pursuant to Administrative Order number 75 of this court and Rule 71A(h) of the Federal Rules of Civil Procedure to determine the issue of just compensation for the taking of the property herein condemned files the following report.

1.    The Notice and Amended Complaint in this cause, with property description, were filed April 21, 2006. The order of possession, the investment order and the order appointing commissioners were entered shortly after that. The date of taking of this case was April 21, 2006.

2.    On May 12, 2010, the Commission met with the parties, their counsel and expert witnesses for a view of the property at the Jordan tract.

3.    The trial of this matter commenced on May 13, 2010 at the offices of Jones, Hawkins and Farmer in Nashville, Tennessee. It was agreed by the Parties through their counsel that Commissioner Farmer could be absent from the hearing. He will review the testimony and evidence in this matter and participate in the decision and report of the Commission. Commissioner Framer was present at the viewing. By his signature below Commissioner Farmer certifies that he has so participated.

4.    The take is in two sections as it crosses the Jordan property comprising 21.4 acres, more or less.   The easement is designated  as CMT-39, which is 19.87 acres, and CMT 42, which is 1.53acres +/- on the plan and profile map which is part of the Clarksville-Montgomery Transmission Line.   Exhibit 1 which is the plan and profile map describes the underlying easement as well as provides a physical description of the power lines and topography of the land.  It specifically lists the types of poles and structures which are on the easements described.  A full size copy of the plan and profile map is Exhibit 1.

The following facts were stipulated:

A.  The Landowners/Defendants are Jeffrey H. Jordan and his wife Patti B. Jordan.

B.  The subject property is in Palmyra, Tennessee in Montgomery County.

C.  The right of way in this taking comprises two segments across the Jordan property; one, the easternmost, is designated CMT-42 and is 1.53 acres and the other is designated CMT-39 is 19.87 acres. Both are shown on stipulated Exhibit 1., the Plan and Profile Map, sheets 5 and 6 of 18. The total take in this case is 21.4 acres.

2

D.  There are five lattice towers on the property, varying in height from eighty to one hundred twenty feet tall, which carry the power lines.

E.  One tower has buzzard guards below the aerial ground wires but above the conductors. They are designed to prevent the buzzards from roosting on the top portion of the structure in between the aerial ground wires and the conductors.

F.  The acreage of the subject is approximately 573 acres. It has frontage on Russell Road, Tarsus Road, Benton Ridge Road and Bailey Road.

G.  Exhibit 2 is an aerial photograph of the property.

H.  April 21, 2006 is the date of taking.

I.  The line is a 500 kilovolt line with three circuits and two aerial ground wires.

J.  The width of the right of way is 175 feet.

5.  Exhibits admitted at the hearing were as follows:

Exhibit 1   Plan and Profile Map;

Exhibit 2   Aerial photograph of subject property:

Exhibit 3   Collective exhibit of pictures of land before easement imposition;

Exhibit 4   Collective exhibit of pictures of land after clearing of land and construction of towers and lines;

Exhibit 5   Terry Evans Appraisal Report;

Exhibit 6   Tim Thompson vita;

Exhibit 7   Mark Johnstone Summary Appraisal Report;

Exhibit 8   Mark Johnstone Transmission Line Right of Way Study, dated October 23, 2009.

Case 3:06-cv-00421   Document 18   Filed 09/23/10   Page 3 of 29 PageID #: 352

6.     This case involved the acquisition of rights over an easement and right of way over 21.4 acres of land, more or less, in Montgomery County, Tennessee. The total size of the tract from which the easement is taken is approximately 573 acres as stipulated. The parcel is able to be seen in the maps and in the various expert reports. The Commission also drove over and walked over a large area of the parcel with the parties for several hours. The rights taken are more particularly described in the Declaration of Taking which is of record in this case as well as in the Plan and Profile Map, Exhibit 1. The land taken and the easement is dedicated by the Tennessee Valley Authority as tracts number CMT-39 and CMT-42. From the plan and profile map, Exhibit 1., as well as a review by the commission, the easement is 175 feet wide. The commission noted that the easement crosses the property approximately west to east in the approximate middle of the property viewed north to south. The power line was constructed prior to the take. The power line has 500,000 volts in three circuits of three wires each with two aerial ground wires above it. The total wires are eleven. The total towers are five. One, Structure 52, has buzzard guards installed.

7.     The landowners called Terry Evans to testify as an expert appraiser. It was stipulated that he was an expert entitled to offer opinions but his methodology was timely objected to by TVA counsel. His appraisal was admitted as Exhibit 5. (Tr. p. 15) Mr Evans has observed approximately thirty vultures/buzzards on the tower and that many more flying around it. (Tr. p. 17) TVA asserts the protectors are to keep the buzzards from roosting over the wires and defecating on them. (Tr. pp. 18-19) The highest and best use is agricultural and residential. (Tr. p. 20, Exhibit 5, p. 31) The

4

property is so large it could be divided into smaller parcels without having to get zoning approval or file a plat with the county. (Tr. p. 20) The property could have been a showplace farm but was being operated as a working farm by Mr. Jordan. (Tr. p. 21) He decided there were two different types of property on the Jordan tract, the largest part being agricultural but with some residential areas with road frontage being impacted by the power lines. (Tr. p. 24) Unimpacted areas on Benton Ridge Road were not included. (Tr. pp. 24-25) Three areas were shown on a not to scale map of the property on page 55 of Exhibit 5.. They show the residential areas that Mr. Evans opined were impacted by the power line. (Tr. pp. 30-31) All areas impacted, including potential isolated remainders were drawn or portrayed by the use of an aerial photograph measuring device. (Tr. pp. 31-32)

8.      Mr. Evans used three comparable sales for the agricultural portion of the Jordan tract which are noted on page 36 of his report (Exhibit 5.) and three comparable sales for the area that could be used as residential which are noted on page 41 of his report (Exhibit 5.) The values for the agricultural land were $2,600 per acre and the value for the residential land was $4,500 per acre. (Exhibit 5. pp. 37 and 40, Tr. pp. 35-38) Mr. Evans also assessed $25,000 in damages for lost timber from the land. (Tr. pp. 38-39, Exhibit 5. P. 42) He opined there were 528.75 acres of agricultural land and 43.65 acres of residential property for a total land value before the take of $1,596,175. (Exhibit 5. P. 42, Tr. p. 40) Mr. Evans included the value of the timber as part of his overall value of the land. (Tr. p. 40) The easement taken included 9.07 residential acres valued at $4,500 per acre for $40,815 initially  and 12.33 agricultural acres valued at $2,600 per acre for $32,058 totalling $72,873. He also found incidental

5

damage to areas identified as A., B., and C. on the map in his report at page 55 of Exhibit 5. (Tr. pp. 41-42) He applied the "Farm Bureau" rule to the zoning of residential areas. (Tr. p. 43) This "rule" derives from Farm Bureau sponsored legislation that essentially exempts five acre lots from the requirements of local planning commissions. There is frontage on Russell Road that allows the creation of five acre lots. (Tr. p. 44) He damaged the residential areas outside of the easement at fifty percent (50%) and the agricultural areas outside the easement at fifteen percent (15%). (Tr. p. 45) He noted three major reasons for damage to the agricultural areas. They were erosion, diminution of view, and nuisance. (Tr. pp. 47-50) He cited various elements of nuisance including buzzards, smell, droppings, people riding rights of way in four wheel vehicles, and lightning strikes. (Tr. pp. 52-56) The Government objected to matters supposedly outside the report. The Government did not choose to depose Mr. Evans to determine if there were causes or reasons for his opinions that they should know of. They had ample time to do so. It was obvious to the Commission that the issues around the towers, buzzards and other matters growing out of the easement and the power line were apparent or easily discoverable. All of these elements are mentioned on Page 47 of Exhibit 5., the Evans Report, and were known to the Government. The Commission finds no prejudice to the government by Mr. Evans' testimony about buzzards and bikes. TVA's objection is overruled.

9.    Mr. Evans denied he had seen the Johnson Report. (Tr. p. 59) He identified the comparable sales east and northeast of the subject through research on sales. (Tr. p. 60) He looked for sales in the area and found two southeast of the subject and one

northeast of the subject. (Tr. pp. 61-62) He did not include a sale on Weeze Lane because it does not look like the subject. (Tr. p. 62) He has not looked at or discussed the Johnstone Report. (Tr. p. 63) He based his residential value on three comparable sales. (Tr. p. 64) He did not do a residential analysis on Benton Ridge Road. (Tr. p. 69) He did not do a subdivision analysis on the lots. (Tr. p. 72) He indicated absorption analysis would not be used for rural properties in this area where people develop rural properties. (Tr. p. 75) There was extensive discussion about buzzards/vultures with Mr. Evans ending by saying that the experts he had consulted said that vultures could be scared off but would return if what attracted them was still there. (Tr. p. 85) He indicated the three comparables sales were mixed pasture and woodland. (Tr. p. 87) He indicated he did not use buffer zones in this case. However he defined the areas he felt were residential around the easement. (Tr. p. 90) He damaged the easement at ninety percent, in part because of the ability to use communication circuits. (Tr. p. 92)

10.     The Government admitted there is a communication circuit in the aerial ground wire. (Tr. pp. 92-93)

11.     Mr. Evans found damage to the agricultural area outside the easement of $400 per acre which is 15.4%. (Tr. p. 96) His opinion of 15% damage outside the easement is based on his experience over the years. (Tr. p. 98) Mr. Evans indicated there would be different effects on value if the property were divided in different ways. (Tr. p. 99) The Government moved to strike based on ***Midwestern Gas Transmission v. 3.90 Acres of Land in Sumner County, Tennessee***, (M.D. Tenn. 2009, Judge Trauger) 2009 WL 5217000. While not clearly stated as the basis of the Motion to Strike, the

Case 3:06-cv-00421   Document 18   Filed 09/23/10   Page 7 of 29 PageID #: 356

Commission deems the motion to be based on the same proposition as *Midwestern Gas*, i.e, was the opinion based on "a single detailed, yet entirely speculative use of the property?" See, ***Midwestern Gas***, at p. 1. Midwestern Gas is distinguishable for several reasons. First, in Midwestern Gas, the expert opined the entire farm was to be developed in a certain way. That is not the case here with Mr. Evans opinion. Second, here there is support for this type of development, such as was opined by Mr. Evans, in the comparable sale Number One of Lee to Beshear in which 4.36 acres sold on August 5, 2005, for $20,000 or $4,587 per acre. This sale was eight months before the take, was across the street, was geographically and topographically similar, was for a similar size lot as proposed by Mr. Evans,and was for almost exactly the same value as he assigns to the residential portion of the Jordan property. Hence the sale meets the requirements for comparability. "[C]omparability is a function of three variables: the respective characteristics of the properties, their geographic proximity to each other, and the closeness in time of the sales." *United States v. 68.94 Acres of Land,* *918 F.2d 389, 399 (3d Cir .1990)*; Unif. Appraisal Standards 47 (specifying nine "basic elements of comparison": property rights conveyed; financing terms; conditions of sale; market conditions; location; physical characteristics; economic characteristics; use and zoning; and non-realty components of value included in the sale property). The Lee to Beshear sale is similar property being across the street from the Jordan property and it was sold eight months before the date of take. Mr. Evans suggestion of residential lots based on that sale is not speculative. The Commission agrees. Hence the Government's Motion to Strike his testimony is DENIED.

8

12.     The Government next objected to and moved to strike Mr. Evans testimony based on *United States of America ex rel. TVA v. Easements and Rights of Way over 6 Acres of Land*, 117 Fed. Appx. 422, (6th Cir. 2004), (referred to by counsel as the *Steam Mill Ferry* case, from one of the parties in that case.) The Commission notes as an initial proposition that the Steam Mill Ferry case involves a taking over part of a sand mine. Specifically the damages flowed from a loss of royalty payments resulting from less land being available to Steam Mill Ferry Partners to mine for sand. There were three factors in the Sixth Circuit's decision. First, what is the accurate measure of compensation? It is the difference between the fair market value of the whole tract before and after the taking, citing *United States of America v. 2847.58 Acres of Land,* 529 F.2d 682, 686 (6th Cir. 1976) Second, did the evidence support the rate of mining? Third, did the evidence support the idea that areas outside the actual easement were affected See, 117 Fed. Appx. 422 at page 4. Frankly, the Commission sees little relevance of the cited case to the present case. If the Government is suggesting that damages must flow from the before and after value of the entire tract, that is covered in the *Instructions*. If the Government is suggesting that there is no evidentiary basis for Mr. Evans' methodology it is wrong because he did not include potential damage to five acre lots on Benton Ridge Road. Mr. Evans testified he felt those areas, as well as the Jordan home, were too far away from the line to be damaged, so he did not damage them. The Commission notes that the Government has argued this exact same analysis as Mr. Evans has done and same position in at least one recent case before the Commission. Nonetheless, there is an evidentiary basis for saying the Benton Ridge Road parts of the Jordan property are too far away

9

to be damaged. Mr. Johnstone does not damage it either. Finally the Government may be objecting to Mr. Evans methodology. He simply states he does not do a subdivision analysis. He is not required to, unless he is suggesting the development of a subdivision, which he is not. He relies upon what is frequently called the Farm Bureau Rule, T.C.A. §§13-3-401 and 13-4-301, which provides that a division of land into lots of five acres or larger does not require planning commission approval or submission of a plat for approval. This statute supports Mr. Evans' suggestion of five acre lots on the Jordan property    viable as a matter of law. The Lee to Beshear comparable sale is evidence of  its economic viability. Hence the methodology is sound and the Government's second motion to strike is DENIED.

13.      The residential areas are possible because all are next to available roads, electricity and telephone service. (Tr. p. 103) The four hundred dollar per acre estimate of damage to agricultural areas outside the easement area  he made was a result of studies he has done, his experience, and judgment. Its his opinion. (Tr. p. 104) Five acre lots are viable due to demand from people who work at the Cumberland power generating plant or the gypsum plant or other industrial plants. (Tr. pp. 105-106)   The closest subdivision is five miles from the subject. There is public water on Benton Ridge Road. (Tr. p. 108)  Appraisers and realtors advised Evans that there was a demand for five acre tracts  near the subject property. (Tr. pp. 110-111)

14.      The landowner called Tim Thompson as a witness. He has been a realtor since 1991. (Tr. p. 117) One of his specialties is marketing large properties.  (Tr. pp. 118-119) The Jordan property is the type of large farm he would sell. (Tr. p. 124) Buyers

10

of these properties do not like to see power lines or gas lines. (Tr. p. 125) The presence of power lines "diminishes the value" of property. (Tr. p. 126) The Government objected to Mr. Thompson offering testimony about value of property. He was offered to suggest an impact on the list price of property of transmission line towers. The landowner' position is that Thompson is allowed to testify about value under T.C.A. §62-39-335. The Commission admits his testimony, but no weight is given to it as directly related to valuation as he did not do an appraisal of the property. Only a little weight is given to his testimony on the issue of demand for five acre tracts in the area. Thompson further testified that the difference in list price would be from ten to twenty-five percent. (Tr. p. 130) His opinion was based on the value of the property as a whole. (Tr. p. 132) He has two properties for sale now that are large farms, neither are in Montgomery County. ( Tr. p. 136) His opinion is based on being with buyers and sellers, not specific market data. (Tr. pp. 136-137) The price reductions come after listings and getting no buyers then prices are reduced. (Tr. p. 138) He also indicated the asking price is lower. (Tr. p. 139). We agree with the government that such a process of valuation is insufficient to support an opinion as to value.

15.    The landowner, Jeffrey Jordan, was called as a witness. The subject farm was purchased in 1988 (Tr. pp. 140-141) "(I)t was a beautiful place." (Tr. p. 142) It is a profitable cattle farm. (Tr. p. 143) It could be plotted off in lots. (Ibid.) The buzzards are a problem. They have killed many calves. (Tr. p. 144) It is uneconomical to take a calf to a veterinarian. (Ibid.) A neighbor paid $4,000 to $4,200 per acre for his farm. (Tr. p. 146) He opined the before value was $4,000 per acre and the after value was

11

$2,000 per acre. (Tr. p. 151) He has experienced two years of not being able to us EIDs, lower calving percentages and lower calf crops. (Ibid.) The farm will never be the same because the line went through the middle. (Tr. p. 154) On cross examination Mr. Jordan disagreed with the idea of selling off portions of the property. (Tr. p. 157) He felt the Government stole $25,000 to $30,000 worth of timber because they told him he could not cut it, and they retaliated against another landowner for cutting his timber. (Tr. p. 160) The highest and best use is as a retreat. (Tr. p. 161) The inability to use EID (Electronic identification device) tags costs $5,000 per year. (Tr. p. 162) Buzzard droppings and a hundred buzzards on a tower is a big detraction from value. (Tr. p. 163) He has not attempted to get free buzzard removal. (Tr. p. 165) The problem with EIDs is that they cannot be read close to a tower. (Tr. p. 167) Moving the calving shed as suggested  would cost $75,000. (Tr. p. 168) In response to a question from the Commission he has experienced a tingling or shock when walking under the towers. (Tr. p. 173) The EIDs can be read electronically but he does not have the ability to do so. (Tr. p. 174) Since the construction of the power line the fertility rates of his cows has dropped from 96% to 90%. (Tr. p. 175) That is a $8,190 per year loss based on $650 per calf. (Ibid.) The EID loss is $2 to $5 per pound so the loss is $5,040 to $8,800 per year. (Ibid.) He assigns a 50% loss factor to the value of the farm based on the change in the look occasioned by the presence of the towers. (Tr. p. 176)

16.     Mark Johnstone was called as an expert witness for the Government. His expertise was stipulated, his methodology was not. (Tr. p. 179) He inspected the property September 12, 2007. (Tr. p. 181) He used the sales comparison approach to

valuation. (Ibid.) He utilized six comparable sales generally in the southwest quadrant of Montgomery County. (Tr. p. 182)  He used the comparables Terry Evans used and others.  His approach is to find sales that bracket the subject in size, geographic location and characteristics. (Tr. p. 183) His three additional sales were lower in price. (Ibid.) He looked at comparable sales toward Cumberland City and they were a lower price than ones toward Clarksville. (Tr. p. 185)  His analysis of comparable land sales is on pages 11-15 of his Report, Exhibit 7. He had an adjusted price of $1,800 per acre. (Tr. p. 187, Ex. 7. p. 14) He saw no premium for either hobby farms in Dickson County or large farms in Montgomery County. (Tr. p. 188) He was critical of the Evans Report because it used farms that were east of the subject because it was "cherrypicking" properties closer to Clarksville. (Tr. p. 189) He valued the entire property as agricultural. He opined the highest and best use was agricultural/recreational. (Tr. p. 190)  He was critical of the Evans approach to valuation because he said if he were to value residential areas he would have to value them all. Those areas included Benton Ridge Road, the north of Russell Road and Tarsus Road. (Tr. pp. 191-192) He opined that using five acre lots would impact agricultural use. (Tr. p. 192) He also discussed absorption time, however, there was no subdivision analysis. (Tr. p. 193) There were thirty-two other lots that would have to be considered and he thought the road would have to be upgraded (Tr. pp. 193-194) He thought the six lots Mr. Evans designated would not be sold within a year. He thought it would take eight years to sell the other lots. (Tr. pp. 195-196) He felt the sales were not economically feasible and so were not a basis for value. (Tr. p. 197)  He opined the Evans methodology was inconsistent with professional standards.

Case 3:06-cv-00421   Document 18   Filed 09/23/10   Page 13 of 29 PageID #: 362

(Tr. p. 198, 217) He damaged odd shaped remainders outside the right of way. (Tr. p. 200) He damaged the areas within the easement at ninety percent and the areas in the odd shaped remainders at seventy-five percent (one and two) or ninety percent (three) (Tr. p. 202, Exhibit 7. p. 19) He applied damage for trees in the danger areas, but not the easement or the odd shaped remainders. He felt the trees were included within the value of the property damaged. (Tr. pp. 203-204) He felt that if trees were valued separately, as if on the stump, that the end result would be the same. (Tr. p. 205)

17.    He did a study. He felt there was no difference in price. (Tr. p. 206) His study showed no damage outside of rights of way in agricultural and recreational uses. (Tr. pp. 208-209) Based on his study of Dickson County farms he did not feel power lines were lowering values. (Tr. 213, Exhibit 8) Finally he was asked about buzzards and stated that he was told various government agencies would remove buzzards at no cost to the landowner. (Tr. pp. 223-224) Accordingly he saw no basis for diminution of value based on buzzards. (Ibid.)

18.    On cross examination Mr. Johnstone indicated he had worked for landowners and when doing so had found incidental damage outside the easement area. (Tr. p. 226) He agreed the highest and best use of the subject property is mixed use including agricultural and residential. (Tr. p. 232, Exhibit 7. p. 9) He saw no damage to the Jordan house. (Tr. p. 234) It was too far from the easement to be warrant an inspection. He agreed the Jordan property had superior access and frontage. (Tr. p. 236) Road frontage is necessary for five acre tracts. (Tr. p. 237) The data showed that two hundred acre tracts were sold for more per acre than five hundred acre tracts. (Tr.

14

p. 238) At the end of the day, after considering adjustments, he forms a qualitative opinion as to value. (Tr. p. 240) His Weeze lane comparable sale (Number 2) has a gas pipeline and a flood easement. (Tr. p. 245) Comparable number three was near Stewart County and remote. (Tr. p. 248) On number four he stated "they just got a good buy". (Tr. p. 250) In his study there was a power line within the subdivision so all sales within the subdivision are at or near the line or away from it. (Tr. pp. 251-252) He agreed paired data analysis requires sales that are equivalent in all respects except one. (Tr. p. 258) The properties in one of his studies were in a growth area. (Tr. p. 267) It was, in his opinion, proper paired data analysis to either aggregate values or make adjustments to reach the result. (Tr. p. 270) He did a group data analysis. (Tr. p. 274) He felt there was no damage outside the right of way on large acreage tracts. (Tr. p. 276) He objected to the Evans use of residential because he did not do subdivision analysis. (Tr. p. 281) He agreed that $4,500 per acre was proper for the proposed residential areas but did not feel they would sell quickly. (Tr. p. 282) He indicated that $2,000 or $2,500 per acre might be feasible on the residential lots. (Tr. p. 285) Mr. Johnstone was asked about the extraordinary view, the uniqueness of the property, the versatility of the property, and the total impression of the property. What is valued is the market and there is no other way to measure a special value. (Tr. pp. 288-290)

19.    The landowner, Mr. Jordan, was called in rebuttal. He had not received the materials the Government witnesses used. He further marked areas served by water lines. (Tr. p. 295) The road suggested by Mr. Evans is a county road. (Ibid.) It would

be paved at no expense. (Tr. p. 296) He felt there was damage to the view on the whole property from the power line. (Tr. p. 298)

20.     Below is a table summarizing the opinions of the landowner and the appraisers. This summary is not the entirety of their opinions but lists the major relevant parts:

| Appraisers/ Landowner | Mr. Jordan- Landowner | Evans | Johnstone |
|---|---|---|---|
| Highest and best use | Development | Agricultural/res. devel. | Agricultural/recreational |
| Value per acre | 4,000/acre | 2,600/acre/agri. 4,500/acre/resid. | 1,800 per acre |
| Percent of damage | 50% property as a whole | 90% easement 60-75% remndr. 95% to .11 iso/rem | 90%/easement 75-90% remndr. |
| Damage to easement | | $65,586 | 34,668 |
| Incidental damage | | 287,381 remainder 25,000 timber | 5,872.50 11,274 timber 9,510 w/in;1,764 w/o |
| Property as a whole | 1,144,800. | | |
| Amount due owner | 1,144,800 | 378,000 | 42,304 |

21.     The differences of opinion of the witnesses involved the underlying value of the property, whether to assess incidental damages, whether some areas were residential, timber values and allocation, and the existence and extent of incidental damages. There was also a significant disagreement with regard to the value of the underlying property. The underlying value of the property was within a range of $1,800 per acre to $2,600 for the agricultural value and up to $4,500 for residential value per acre.

16

The landowner's appraiser also assigned residential value to a portion of the take and that was $4,500 per acre. There were substantial differences as to the amount of incidental damage ranging from damage to three irregular and/or cutoff remainders in the amount of $5,872.50 to damaging the entire remaining agricultural portion of the property in the amount of $206,568. Total damages varied from $42,304 to $378,000 from the appraisers to $1,144,800 from the landowner. The Commission is not required to accept either the high or low testimony but may form its own judgment as to the total loss occasioned by the take. The Commission must be realistic and make its judgment as to what testimony is realistic. See, *U.S. ex rel. TVA v. Easement in Logan County, Kentucky*, 336 F.2d 76, 80 (6th Cir. 1964), on remand 246 F. Supp. 263, aff'd 375 F.2d 120 (6th Cir. 1967). Testimony which is unreasonable and would, to the Commission's own knowledge, be inconsistent may be disregarded. See, *Instructions to Commissioners*, 61 F.R.D. 503, at 507-508. The fair market value for the highest and best use of the property is the generally accepted standard for determining "just compensation" if the property is taken by condemnation. See, *United States v. 1,291.83 Acres of Land*, 411 F.2d 1981 (6th Cir. 1979).

22. The Government made two motions to strike the expert testimony of the landowner. Both of these motions were DENIED for the reasons set out above. The Commission notes that the Government's own expert, Mr. Johnstone, a former Chairman of the Tennessee Real Estate Appraisal Commission, testified that an appraiser was entitled to use his own where there was an issue of impact of diminished view in an appraisal. As long as the appraiser believes the diminution in view impacts market value, it can be considered.

17

23.     Generally a district court's decision to admit or not admit expert opinion and reports is reviewed on an abuse of discretion standard. See, *General Electric Co. v. Joiner*, 522 U.S. 136, 138, 118 S.Ct. 512, U.S.Ga. (1997). *General Electric v. Joiner* was a jury case. Where the factual bases of a study are so dissimilar to the facts of the case at issue it is not an abuse of discretion for a trial court to reject the study. *General Electric, supra*, 522 U.S. at 144-145. "The gatekeeper doctrine was designed to protect juries and is largely irrelevant in the context of a bench trial." See, *Deal v. Hamilton County Board of Education*, 392 F.3d 840, 852 (6th Cir. 2004). This is especially true given Mr. Johnstone's own testimony that it was a matter of opinion and the stipulation by the Government that Mr. Evans could offer an opinion as an appraiser. The Commission consists of three lawyers, it is neither an Article III court, nor a jury. We feel we can give proper weight (generally very little) to studies without excluding their admission into evidence. This we do here. It is worth noting that both TVA's and the Landowner's experts found damage to the area outside the easement, they differed only as to its extent, albeit very substantially.

24.     Further, the *Instructions to Commissioners*, under which this Commission operates, 61 F.R.D. 503, 506 (E.D. Tenn. 1973, Judge Taylor), have an extensive discussion about the assessment of credibility and the weighing of the evidence. As Judge Taylor noted there, "Expert or opinion testimony is only as good as the facts and assumptions upon which it is based and if such testimony is without any support in the demonstration and physical facts, it is worthless and may be disregarded....  In considering such testimony it is your duty to determine whether such opinion is correct or erroneous, and in arriving at your conclusion you should consider the

18

manner and demeanor of the witness, the bias or lack of bias, the grounds upon which the witness based his opinion, his experience and knowledge of the matters about which he is  testifying, particularly his knowledge of the property, along with other evidence in the case, and the reasonableness or unreasonableness of his opinion as viewed in the light of the knowledge and experience of the witness."

25.     The studies presented did not adequately address how they came to be done, what questions they were addressing and generally the "methodology and explanatory power of the statistical analysis...". *Taylor v. Proctor and Gamble Company*, 178 F. 3d 1296, (Table), 1999 WL 232695 (C.A. 6 (Ohio)) citing, *Simpson v. Midland-Ross Corp.*, 823 F. 2d 937, 944 ([6th] Cir. 1987). As the *Taylor v. Proctor and Gamble* court stated," Statisticians working from the same corpus of data often disagree at trial on the statistical significance of data - based on collection techniques, sampling methods, groupings, calculations used, control variables, etc." *Ibid.*  Here the experts were clear that they did not control their variables. There was significant disagreement over what the variables should be, as noted at length in cross examination For a statistical study to "contribute anything of value" it is necessary that "the data base numerically mirrors reality. If it does not in substantial degree mirror reality, any inferences empirically arrived at are untrustworthy." See *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 1765 (1987) citing *McCleskey v. Zant*, 580 F. Supp. 338, 353-360 (N.D. Ga. 1984). Based on the various cross examinations this was especially troubling to the Commission since there was little, if any, clarity about exactly what reality the database mirrored. Control of variables is important, particularly in this case and in

19

land commission valuation cases generally, because what is being attempted to be done is the measurement of the influence of "potentially influential variables".

26.     Here the variable(s) is/are the effect on property values and saleability of property caused by the placement of a powerline easement on property and the actual construction of powerlines. As Mr. Moore has noted in the statistical text he edited:

> "Correlation and regression describe the relationship between two variables. Often the relationship between the two variables is strongly influenced by other variables. We try to measure potentially influential variables. We can then use more advanced statistical methods to examine all of the relationships revealed by our data. Sometimes, however, the relationship between the variables is influenced by other variables that we did not measure or even think about. Variables lurking in the background, measured or not, often help to explain statistical associations.
> "A lurking variable is a variable that is not among the explanatory or response variables in a study and yet may influence the interpretation of relationships among those variables...A lurking variable can falsely suggest a strong relationship between X and Y, or it can hide a relationship that is really there...
> "Association is not causation. When we study the relationship between two variables, we often have to show that changes in the explanatory variable cause changes in the response variable. But a strong association between two variables is not enough to draw conclusions about cause and effect. Sometimes an observed association really does not reflect cause and effect.
> "An association between an explanatory variable X and a response variable Y, even if it is very strong, is not by itself good evidence that changes in X actually cause changes in Y.
> "The best way to get good evidence that X causes Y is to do an experiment in which we change X and keep lurking variables under control...When experiments cannot be done, finding the explanation for an observed association is often difficult and controversial. Many of the sharpest disputes in which statistics plays a role involve questions of causation that cannot be settled by experiment."

See "The Practice of Business Statistics Using Data for decisions", Ed. By Moore, Mccabe, Duckworth and Alwan, New York: W.H. Freeman and Co., 2009.

27.     The Commission is bound by Judge Taylor's admonition in the *Instructions*. The Commission must consider the grounds upon which the witness bases his or her opinion and if they do not exist may disregard the opinion. As far as the so called

"studies" go the Commission has considered them and finds them deficient because of their failure to control variables. In the Commission's view none of the proffered studies adequately controlled variables. The Commission does not question their expertise, only the weight to be accorded such "studies".

28.     In this case, the Commission believes the assessment of value issue has two parts, using the method allowed in the *Instructions* of assessing the damage to the land as a whole. The first of these is what is the underlying value of the property. The second is the amount of damage to the property as a whole. The landowners assessed value at $4,000 per acre. Their appraiser assesses the underlying value at $2,600 per acre for the agricultural portion and $4,500 per acre for the residential portion. The Government's appraiser assesses value at $1,800 per acre.

29.     The comparables used by the various appraisers are listed in their reports. Both appraisers used three of the same comparables. These were: Evans #1 and Johnstone #6 the sale from Batson to Blackwell, being 219.39 acres on Batson Road which sold December 27, 2006 for $460,000 or $2,097 per acre (It is noted that the Government appraiser reports a size of 216.090 acres and per acre value of $2,129.); Evans #2 and Johnstone #5 the sale from Baxter Heirs to Mace, being 211.66 acres on Grays Chapel Road which sold December 1, 2006 for $529,160 or $2,500 per acre; and, Evans #3 and Johnstone #1 the sale from Smithson to Powers, being 210.36 acres which sold January 6, 2005 for $450,000 or $2,139 per acre (It is noted that the Landowner appraiser reports a per acre value of $2,230). All were used by both appraisers. The Government appraiser used three additional comparable sales. The Commission deemed them less comparable than the three listed above and used

jointly by both appraisers. Of the additional comparable sales, one was near Stewart County and remote (Tr. p. 248); another (Weeze Lane) has a gas pipeline easement and a flood easement 9Tr. p. 245); and the other (Southside Road property) "they just got a good buy." (Tr. p. 250). These three sales we give little weight to.

30.     The Landowner's appraiser also used three comparable sales for residential property comparables. He was not challenged on these sales except than the underlying premise of whether there could be any residential areas on the property about there was strong disagreement. To determine land value of the subject, we therefore give the most weight to the three sales listed above which were used by both parties.

31.     The Commission credits Mr. Evans' testimony and report as to the value of the land and specifically as to its possible uses, either agricultural or residential. Mr. Evans' designation of some portions of the subject property as being residential is reasonable given the existence of T.C.A. §§13-3-401 and 13-4-301, otherwise known as the Farm Bureau Rule, which provides that a division of land into lots of five acres or larger does not require planning commission approval or submission of a plat for approval. This statute together with the testimony of demand for such size lots in the area supports Mr. Evans' opinion that selling five acre lots on the Jordan property would be reasonable. The Lee to Beshear comparable sale is also evidence of its economic viability. The Commission finds that it is a common and recognized practice for formerly agricultural land in rural areas with extensive road frontage to be divided into tracts approximating five acre. Hence Mr. Evans suggestion of residential areas on the Jordan property is reasonable. The Government also

22

vigorously attacked Mr. Evans suggestion of residential areas because he did not do a subdivision analysis. He is not required to. He notes the residential areas, which in relation to the total Jordan property are small and limited to the areas around the power line easement, are on roads and have utilities available. He stated without contradiction that the lots could be easily sold. Mr. Jordan noted that Russell Road would be paved at no cost by the county as it was a county road. He further notes the Lee to Beshear comparable which is across the road and close in time, i.e., eight months prior, to the date of take as well being slightly higher than Mr. Evans indicated value. For these reasons the Commission deems the designation of certain areas as residential without need of development costs as reasonable and the assigned value of $4,500 per acre as reasonable.

32.     The Government also challenged Mr. Evans' assessment of damages to the remaining agricultural areas at $400 per acre. The Commission viewed this property to "enable them (Commissioners) to better understand and weigh testimony which they hear." The Commission may 'take into consideration what you (Commissioners) will see on the view; and you will base your awards on both the view and the testimony you will hear." See, *Instructions*, p. 3. Whether the property outside the easement is agricultural or agricultural and recreational it's value is diminished by the presence of the powerline. Mr. Evans notes at page 47 of his report (Exhibit 5) that there is an erosion issue, which was observed by the commission at the view, a diminution of view issue, also observed by the Commission at the viewing, and a nuisance issue, also observed by the Commission at the view. Mr. Johnstone agreed that $4,500 was an appropriate value for residential (Tr. p. 282) He also stated the

land was appropriate for mixed use of agricultural and recreational. (Tr. p. Tr. p. 232, Exhibit 7 at p. 9.) Mr. Jordan further testified credibly about the economic and operational impact of the power lines. These impacts extend outside the easement area. For these reason Mr. Evans assessment of $400 per acre damage to the agricultural area outside the easement area is credible and the Commission accepts it. While the Commission heard evidence of various "costs" associated with the powerline's presence, the $400 per acre damage figure was the only amount tied to the market through the opinion of the expert.

33.     The Government also challenged Mr. Evans' assessment of damage from timber taken. Mr. Evans opines the landowner is due $25,000 for the loss of his timber. The Commission notes Mr. Jordan testified credibly that when he asked to cut the timber and sell it he was in effect "threatened" by the Government representative with retaliation if he did so, with the representative saying, in effect, wait and see what we do to another person who did sell the timber off his property, and then having complied with the threat was treated the same. While there is clearly loss from timber destroyed the Commission is bound by the very specific requirements of the *Instructions* in this regard. Specifically, "if the property contains timber, such timber should not be valued separately but should be valued as a part of the land." See, *Instructions*, at p. 5. In reality both Mr. Evans and Mr.  Johnstone value the timber separately, however, Mr. Johnstone then treats the portion within the easement as subsumed within that land's value, but not the portion without the easement, which he values at $1,764. See, Johnstone Report, Exhibit 7, page 18. The parties thus agree that some assessment of damage due to the loss of timber is appropriate. The

Commission accepts the Government's assessment of $1,764. The Commission rejects Mr. Evans blanket assessment of $25,000 damages for timber. Only the Government actually presented copies of consulting forester's reports to support its assessment. See, Johnstone report, Exhibit 7., pp. 45-47.

34.     A landowner's testimony as to the value of his property is not always sufficient testimony on which a verdict can be based. Mr. Jordan did not offer a specific basis for his assignment of value per acre nor for his assessment of a fifty percent loss to the property as a whole. It is not acceptable for the landowner to show "that his plans have been frustrated by the taking of his property, or what the land was worth to him, because these are all matters which are personal to the owner and do not have a bearing on the market value of the property or the compensation to which the owner is entitled." See, *Instructions*, p. 4. There must be a basis for the landowner's valuation, and when the landowner's own testimony shows that his valuation has no probative value, the court may determine that the landowner's testimony alone is insufficient to support a jury verdict. *Sowards,* 370 F.2d at 92.  A landowner's opinion must have probative value and have a relationship to market value. See, *United States v. 901.89 Acres of Land*, 436 F.2d 395, 399-400 ([6th] Cir., 1970) citing *United States v. Trout*, 386 F.2d 216, 223, n. 10,([5th] Cir. 1967). Here, the landowner's testimony as to land value was not consistent with the actual comparable sales data in the neighborhood which was substantial.

35.     As a result the Commission partially credits Mr. Evans' testimony. With regard to the comparables, as noted above, there were three common comparable sales used by both appraisers on the agricultural area. The Commission deems them the three most

25

comparable sales. Based on these three jointly used comparables, as well as Mr. Evans' comparables on residential land, including one across the street, the Commission credits the value testimony of Mr. Evans as to underlying land value of $2,600 per acre for agricultural and $4,500 per acre for residential. "[C]omparability is a function of three variables: the respective characteristics of the properties, their geographic proximity to each other, and the closeness in time of the sales." *United States v. 68.94 Acres of Land,* 918 F.2d 389, 399 (3d Cir .1990); Unif. Appraisal Standards 47 (specifying nine "basic elements of comparison": property rights conveyed; financing terms; conditions of sale; market conditions; location; physical characteristics; economic characteristics; use and zoning; and non-realty components of value included in the sale property). The court's authority under Fed.R.Civ.P. 71A(h) to exclude evidence of sales of dissimilar properties is affirmed with regularity. "The questions of whether [comparable sales] transactions are near enough in time, or involve substantially similar lands, or significant amounts of land are all questions of the remoteness of the evidence offered and in consequence are for the trial court." *Baetjer,* 143 F.2d at 397. Since no two pieces of land are ever exactly alike, "parcels may only be compared where the dissimilarities are reduced to a minimum and allowance made for such dissimilarities…There is no basis, however, to rely on patently remote transactions when more comparable sales are available. *Cf. United States v. 100 .80 Acres of Land,* 657 F.Supp. 269, 274 n. 7 (M.D.N.C.1987) ("The record supports that the [subject property] is unique in its location and relation to the market, and therefore, that no comparable sales exist.")." See, *U.S. v. 10.082 Acres of Land*, No. CV05-00363-PHX-NVW, 2007 WL 962846, page 4 of 12, ( D.

Ariz. 2007, Judge Wake). The Commission credits Mr. Evans's method of treating a small portion of the Jordan tract as a residential area because it was close enough to be affected by the easement and because it is economically feasible as noted above.

36.     The size, scope and visual impact of this power line, as observed at the view, as documented by the photographs in evidence and as explained and described by the witnesses, is significant. That significance is amplified by the fact that the easement crosses the property through the very middle and "is visible from almost every location on the farm." (Exhibit 5., p. 47) The Commission does accept Mr. Evans's assessment of damage to the easement area and the remainder of the farm as outlined above. The Commission credits the damage to the exact land covered by the easement and the remainder as well as the out of right of way danger tree timber damage as noted above. This yields a total compensation due of $354,731.

37.     The Commission credits the assessment of all appraisers that there is diminution of value to the property based on "apprehension of injuries to person or property by the presence of power lines on the property (which) is based on practical experience and may be taken into consideration in so far as the lines and towers affect the market value of the land." *See, Hicks v. United States for the use of the Tennessee Valley Authority*, 266 F.2d 515, 5[20 (6th] Cir. 1959). This analysis was affirme*d in United States ex rel. TVA v. Easement and Right-of-way*, 504 F.2d 305, 3[09 (6th] Cir. 1968). It must be demonstrated that there is an actual profitable use or a market demand for the prospective use. *See, United States v. Easement and Right-of-Way 100 Feet Wide*, 447 F.2d 1317, 13[19 (6th] Cir. 1971).

27

38.    It is further clear from the testimony of the witnesses that the land has the potential of both agricultural and residential in the reasonably near future. That potential may be used as a basis for a just compensation award. See, *U.S. ex rel. and for the use of TVA v. Hughes*, 251 F. Supp. 930 (E.D. Tenn 1966). The Commission also notes the subject property had all utilities available to it at the time of taking, either on site or very close by.

39.    The Commission is then confronted with the issue of the amount of damages to the property. The Commission's award of loss of value, however, is to be for the fair and reasonable value of the property as a whole. See, *Instructions to Commissioners*, 61 F.R.D. 503, 514 citing *United States v. Myer*, 113 F.2d 387 (7th Cir. 1939), cert. denied, 311 U.S. 706, 61 S.Ct. 174, 85 L.Ed. 459 (1940). The Commission does agree that there is damage from the public apprehension of power lines as noted in *Hicks, supra*. Likewise the Commission may consider as damage the unsightliness of towers and transmission lines in the locality as well as changes in the character of the ground which arises from such clearing. See, *U.S. v. Robertson*, 354 F.2d 877, 880-81 (5th Cir. 1966). See also, *Easement in Logan County, supra*. The landowner had the burden of proving the fair market value of the condemned land. *United States ex rel. and for Use of T.V.A. v. Powelson, 319 U.S. 266, 273, 63 S.Ct. 1047, 87 L.Ed. 1390, 1396-1397 (1943); United States v. 1291.83 Acres of Land, 411 F.2d 1081, 1084 (6th Cir. 1969)*.

40.    Based upon all of the evidence produced at the hearing on this matter, aided by personal examination of the property in the presence of the parties and their attorney, the Commission is of the opinion that the just compensation due the landowner is

$65,586 for the easement taken and $289,145 for incidental damage to the remainder for a total amount due of $354,764. Hence the Commission respectfully reports that the just compensation due the landowner(s) is $354,731.00.

Respectfully submitted,

    /s/William H. Farmer
William H. Farmer, Chairman

    /s/Horace E. Johns
Horace E. Johns, Commissioner

    /s/Jack W. Derryberry, Jr.
Jack W. Derryberry, Jr., Commissioner

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Report of the Commission has been served by CM/ECF system to those registered and if not registered, via U.S. Mail, on this 23rd day of September, 2010.

By:    s/ William H. Farmer
